UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,                           CRIM. CASE NO. 10-20099

v.                                         PAUL D. BORMAN
                                                 UNITED STATES DISTRICT JUDGE

JOSE MUNGIA,

       Defendant.
_____/

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

**I. INTRODUCTION**

On February 15, 2010, Defendant Jose Mungia was arrested in Dearborn, Michigan while driving his tractor-trailer, after a search found it to contain kilos of marijuana, along with a load of broccoli.

Defendant filed a motion to suppress the marijuana on the ground that the seizure violated his rights under the Fourth Amendment. A hearing was held on July 7, 2010. Thereafter, the Court requested and received supplemental briefing.

**II. HEARING TESTIMONY**

    **A. Bazzi's Testimony**

On February 15, 2010, DEA Task Force Officer Madou Bazzi, who had training by the Michigan State Police to discern indicators of possible drug transport inside commercial motor vehicles, observed Defendant's tractor-trailer at Truck City, a truck stop.

1

Bazzi testified that he ordered a marked Dearborn Police car to effectuate a traffic stop after (1) he checked the tractor's California license plate and found that it was not registered, and (2) he surmised that the trailer was overweight, because the trailer was close to touching the rear tires-rear axle. Bazzi TR. July 7, 2010, P.9. Bazzi ran the United States Department of Transportation number on the side of the truck through a public database and found that it was a recently registered company with one driver, who turned out to be the Defendant owner-operator. Bazzi TR. P.11.

As Bazzi followed Defendant's tractor-trailer exiting Truck City he again noticed that the trailer's tires were extremely close to the bottom of the trailer indicating a likely overweight issue. After stopping the truck, he took pictures, and "in this photo . . . (Gov't Exh. #3) there is actually indentation of the undercarriage of the trailer from impact points from the tires." Bazzi TR. P.12.

Bazzi testified that both non-registered plates and overweight trailers are violations of Michigan ordinances. Bazzi TR. Pp. 12-13.

Bazzi testified that while he was conducting checks on the tractor/trailer license plates, the vehicle exited Truck City, and having confirmed the license plate violation, he requested a traffic stop by a City of Dearborn marked police car. Bazzi TR. P. 14.

After the traffic stop at 5:15 pm, Bazzi arrived at the scene and conversed with Defendant in English – requesting and receiving his commercial driver's license and his alien number. The Court notes that at the instant hearing, Defendant requested a Spanish interpreter.

Bazzi testified that pursuant to Federal 49 CFR 391.11, "Commercial motor vehicle operators traveling interstate are required to communicate, read and write English well enough to

make notes in official log books, read signs and answer any official question." Bazzi TR. P. 17. Bazzi requested and received Defendant's bill of lading and his driver's logbook.

After the stop, Bazzi ran Defendant's tractor license plate, registration two or more times, and came up with the same result: no record. Bazzi TR P. 18. Gov't Exh. 4A, which is the printout from Bazzi's dispatcher's running of the license plate check, states: record not on file. Bazzi TR. Pp. 18-19.

Defendant thereafter did provide (Exh. 5) a California temporary registration authorization for his 2002 Kenworth tractor, and also a registration certificate for the trailer. Bazzi TR. P.21.

In response to Bazzi's request (in English), Defendant also provided a bill of lading for the load of 1568 cartons of broccoli from Ocean Mist Farms in Castroville, CA, to Loblaw Grocery Co., Brampton, Ontario, Canada. Bazzi TR. P.22. Their papers included a number, representing the number on the seal affixed to the latch of the trailer door, the purpose of which is to assure the integrity of the product shipped when it arrived at its destination.

Bazzi further testified about conversing with Defendant in English regarding his truck driving experience, and his ownership of the rig. Bazzi TR. Pp. 24-25.

After looking at Defendant's papers, and assessing his answers, Bazzi concluded that Defendant was off-route. Defendant stated that, when stopped, he said he was looking for fuel, but had already passed two fuel stations before reaching Truck City.

Bazzi then asked Defendant if he would mind if the police searched his trailer:

> "He said it wouldn't be a problem, but he had a concern because there was a seal on the trailer."

Bazzi TR. P. 30. Bazzi advised Defendant that he "would be more than happy to put another

3

seal on his trailer," at which point Defendant directed him to the back of the trailer. Then Defendant removed the plastic seal.

At that time, Defendant was not handcuffed, nor was his freedom of movement restricted in any way. Bazzi TR. Pp. 31-32.

Bazzi testified that other factors behind his request for permission to search were:

> 1. Defendant having traveled from a drug source state (California) to a drug destination city (Detroit)[1]
> 2. Defendant being off route
> 3. Having a heavy duty lock, in addition to a seal on his trailer
> 4. Holiday weekend (Presidents Day) means lesser police presence
> 5. Defendant bypassed several diesel stations to go off-route to refuel

Bazzi concluded that there was a likelihood of contraband inside the trailer.

There was also a lock on the trailer which, based on Bazzi's experience, was unusual for produce, which is not a high dollar item such as electronics, etc.

Defendant also unlocked the lock. Bazzi then opened the trailer and observed pallets stacked high with broccoli, but, also that "the boxes on the top level were crushed, so someone had crawled on top of them or maneuvered them in some fashion." Bazzi TR. P.35. Bazzi also looked through the open space at the bottom of the pallets.[2] Looking through the low open

---

[1] The Sixth Circuit has noted that "travel between population centers is a relatively weak indicator of illegal activity because there is almost no city in the country that could not be characterized as either a major narcotics distribution center or a city through which drug couriers pass on their way to a major narcotics distribution center." *United States v. Urrieta*, 520 F.3d 569 (6th Cir. 2008).

[2] The Court takes judicial note of the use of pallets in the food business having previously worked in a food business warehouse. A pallet, usually made of wood or plastic, is used to stack upon it multiple cases of merchandise, and contains an open space at the bottom to permit a forklift truck to lift the pallet off the trailer and stack it on the floor of the warehouse, thereby eliminating the need to case-by-case load and unload the merchandise from the truck.

space on the pallets from the rear to almost the nose of the trailer, Bazzi observed pallets, other than the type holding the broccoli placed in a different manner, leading him to believe "that there was something else there besides broccoli inside the trailer." Bazzi TR. P.35.

Bazzi then pulled his car up to the trailer door, climbed up on top of his car to be level with the trailer, looked in, and "about halfway down the trailer and about the same location as the inconsistent pallet, I observed the corner of a brown cardboard box sticking out from the broccoli." Bazzi TR. P.36.

Bazzi then entered the trailer, went to the midpoint and saw several larger cardboard boxes, 2'x4' with red numerical markings on them. Bazzi TR. Pp. 36-37. Bazzi assumed, based on his experience, that they contained contraband because:

1. The box wasn't packed like the broccoli
2. The numbers could have indicated a sequence number or a weight number
3. It wasn't a proper way to package produce; the bill of lading listed only produce

Bazzi TR.P. 37.

Bazzi opened one of the boxes and found a green/teal-colored bale wrapped in plastic which he concluded to be some sort of bulk narcotic. He cut into one of the bales and discovered "a large quantity of a green leafy substance I believed to be marijuana." Bazzi TR. P.38.

At that point he told fellow officer Whitcomb to arrest Defendant Mungia. Bazzi Tr. P.38. Whitcomb then put Mungia in handcuffs, and placed him in the back of the police car. *Id*. Bazzi tested the substance which was positive for marijuana. Bazzi TR. P.39.

Defendant's trailer contained 648 kilos – about 1425 pounds of marijuana. Bazzi TR. P.39. The total length of the traffic stop was 10-20 minutes, during which time Defendant was neither handcuffed or placed in a police car.

5

On cross-examination, Officer Bazzi acknowledged that Defendant's freedom of movement was restrained during the investigation. Bazzi TR. P.62.

Bazzi testified that the tractor plate had "no record" of it – no record on file; the trailer plate was registered to Defendant Mungia. Bazzi TR. Pp. 45-46.

At a later point in time, after further investigation, Bazzi determined that the plate was proper and Defendant was the owner.

Bazzi never did check the weight of the trailer; overweight would have been a civil infraction.

Bazzi testified that the "unregistered plate" infraction would have been a misdemeanor violation. Bazzi TR. P.48.

Bazzi testified that the Miranda waiver form used at the police station was in the Spanish language, and the Miranda rights had been read to Mungia in Spanish by Officer Cervantes. Bazzi TR. P.49.

Bazzi testified that the Michigan address to which Defendant was traveling, 25991 North Line Road, was a cross-docking facility at which the United States-based trucks drop off the load, which is switched to a Canadian truck that would take it across the border. Bazzi TR. P.52.

Bazzi testified that the California temporary registration to the tractor provided by Defendant finally filled in the missing link into the prior registration search Bazzi had conducted that had initially reported no State of California registration. Bazzi TR. P.53. At this later point, that registration was confirmed as correct.

Bazzi testified that because he had received what he regarded as suspicious answers by Defendant to questions regarding the load, his direction of travel, and where he was going to gas

6

up (he passed a couple stations), he was suspicious, and asked Defendant Mungia for permission to search the trailer. Bazzi testified that Defendant gave him permission. Bazzi TR. P. 55-56. When Mungia stated he "was concerned of [breaking] the seal that was on the trailer", Agent Bazzi told Defendant that he had a new seal that would reseal the trailer.

There was also a lock on the trailer. Mungia broke the seal and unlocked the lock. Bazzi testified that he then opened the trailer, made his observations, discussed *supra*, and climbed into the trailer. His observation included finding an unusual pallet in the center of the load – not the blue pallet usually used for produce and other heavy items. Bazzi TR. P. 57-58.

On redirect examination, Bazzi reiterated that he had noticed the boxes were crushed before he climbed on top. Bazzi also testified that Defendant did not require an interpreter at the scene, and did not speak in Spanish until he arrived at the police station, where Officer Cervantes was present and the interview was both in English and Spanish. Bazzi TR. P. 59.

Agent Bazzi testified that Defendant Mungia was initially detained during the traffic stop, not handcuffed, and that he could have ended his consent to search at any point. Bazzi TR. P.60.

Agent Bazzi testified that he ran the truck registration at the scene no less than 3 or 4 times. Bazzi TR.P.61. Bazzi further testified that after receiving the paperwork, he felt required to ask basic investigative questions because of his suspicions. Bazzi testified that a driver's logbook and paperwork are often falsified.

Bazzi testified that Defendant's route was from a drug source state to a drug destination

city, Bazzi TR. P. 65.[3]

On redirect, Bazzi testified that based on his experience, because of the prevalence of falsified documents, he felt it necessary to ask the driver follow up questions regarding the documentation. Bazzi TR. P. 66.

**B. Whitcomb's Testimony**

Dearborn Police Officer Nicholas Whitcomb, who made the stop in his squad car, testified that Defendant spoke English, and responded to all of his questions. Whitcomb TR. P. 76.

Whitcomb testified that Defendant responded affirmatively to Bazzi's request for consent to search, and that Defendant removed the seal and the lock. Whitcomb TR. Pp.82-83.

Whitcomb testified that when the trailer doors were opened, he looked under the pallets and saw offset pallets located further up inside the trailer. Whitcomb said that when Bazzi decided to search the trailer, Whitcomb, for officer safety, asked Mungia to sit in the car – no force, no handcuffs – and that if Mungia had asked he would have been permitted to exit the car. Apart from needing to close the door to move the car, the car door was always open. Whitcomb TR. Pp.86-87.

After Bazzi found the contraband, he told Whitcomb to handcuff Mungia.

On cross-examination, Whitcomb testified he put Mungia in the car for officer safety when Bazzi went into the truck, leaving him alone with Mungia. Whitcomb TR. P.90.

Whitcomb never told Mungia that he could leave at anytime, but that if Mungia decided

---

[3] The Court does not give much weight to this observation since most states and many, many cities, fall into those categories. See *supra*, n.1.

to leave he would have allowed that. Whitcomb TR. Pp.90-91.

### C. Mungia's Testimony

Defendant Mungia testified that he lives in California and has been driving trucks for 15 years, and had just recently purchased his own tractor and trailer. Mungia TR Pp.94-95.

Defendant Mungia testified that he understands English only as it relates to the trucking business, and that his day to day language is Spanish. Mungia TR. P.96.

Mungia testified that his truck was not overweight; that it had been weighed in New Mexico, at 73,000 pounds, with a limit of 80,000 pounds. Mungia TR. P.98.

Mungia testified that he stopped at Truck City because a Western Union office is located across the street, and he had sent $100 to his wife. Mungia TR. P.100.

Mungia testified that the officer asked if he had the key for the lock, and that when he said yes, the officer told him to open the lock – but the seal remained. He testified that after he opened the lock, he was put in the police car. He further testified that he told the officers they couldn't open the trailer because they needed an order, or to sign something that they take responsibility for opening the truck. Mungia TR. P.101.

Mungia testified that he was not handcuffed when placed in the car. He testified that he told Officer Bazzi, who had driven his car over to the trailer to stand on, to allow him to enter the trailer, that he couldn't walk on top of the food. Mungia TR. P.102.

Mungia testified that Officer Bazzi opened the seal, and that he was not in the police car at that time; "I was in the back door standing, not inside the car." Mungia TR. P.103.

Mungia testified that Officer Bazzi was walking on top of the boxes. Mungia TR. P.104. Mungia testified that he did not give them permission to break the seal.

Mungia then testified as follows:

> Q. At any time did you understand that you could have walked away?
>
> A. Yeah. You could walk away because they were in the truck.

Mungia TR. P.104. Yet again, after the Court overruled the prosecutor's objection, defense counsel apparently hoping for a different answer, re-asked that same question:

> Q. <u>Mr. Cleary</u>: The question is when you were in the back of the patrol car, did you think you could just leave, get out of the patrol car and walk away?
> <u>Ms. Gibbs</u>: It was asked and answered.
> <u>The Court</u>: Overruled.
>
> A. <u>Mr. Mungia</u>: Yes, I believe, but I didn't think of leaving.

Mungia TR. P.105.

On cross-examination, Defendant acknowledged speaking extensively to the officers in English, including the following statements:

> 1. That Bazzi couldn't walk across the back of the truck because "you can't walk on top of the food because of bacteria." Mungia TR. P.105 "not to walk inside." Mungia TR. P.106.
>
> 2. Q. <u>Gibbs</u>: "That they would have to sign paperwork to break the seal..."
>    A. <u>Mungia</u>: Yes.

Significantly, Defendant again testified that when Officer Bazzi was inside the truck, "I was standing by the back door of the patrol [sic] not inside the patrol." He testified that he was not handcuffed and placed inside the police car until after he was arrested. Mungia TR. Pp.106-107.

Defendant Mungia testified that when the truck is not being operated, the air suspension bladders on the trailer aren't inflated so as to raise the trailer to provide more clearance over the

10

wheels. The truck was stopped at Truck City at least 3-3½ hours. Mungia TR. Pp. 108-09.  Thus, when Officer Bazzi first saw Defendant's tractor-trailer at Truck City, it was at repose, with the trailer resting close to the tires, which led Bazzi to surmise that the trailer was overweight. Mungia TR. Pp. 108-09.

Defendant Mungia further testified that he responded in English when the officers asked him to provide his driver's license, to unlock the trailer door, and for other documentation that he was going to get diesel fuel: "I know that because that's my job to talk in English." Mungia TR. Pp. 109-110. Defendant later testified that he told the agents that he didn't speak English well. Mungia TR. P.111.  Mungia also testified that he lived in the United States for 18 years. Mungia TR. P.112.

On redirect examination, Defendant testified that he could not read/write English. Mungia TR. Pp. 113-14.

On rebuttal, the government recalled S.A. Bazzi who testified that Defendant's truck had been at Truck City for 5-7 hours, based on receipts found in the tractor after the arrest, and that the trailer's suspension did not appear to be raised when Defendant drove away from Truck City. Bazzi could not recall that Defendant told him to not walk on the broccoli, and further that Mungia never told Bazzi that he couldn't understand English, nor that Defendant needed someone to translate what the agents were asking him in English.  TR. Pp. 115-16.

### III. LEGAL DISCUSSION

In *United States v. Everett*, 601 F.3d 484 (6th Cir. 2010), the Sixth Circuit discussed

police questioning during a traffic violation stop.

This Court finds that the initial police stop was proper, given the facts known to Officer Bazzi at the time he ordered the stop:

> 1. A check of the tractor's California registration found no proper registration – a misdemeanor violation under Michigan law.
>
> 2. The trailer appeared overweight to Bazzi, who had training regarding tractor-trailer interdiction, because the wheels were almost touching the trailer – overweight is an ordinance violation.

The Court finds, that even if the second violation claim does not pass muster, because the agents never weighed the vehicle, the first violation, by itself, supports the vehicle stop under *Whren v. United States*, 517 U.S. 806, 813 (1996) "the constitutional reasonableness of traffic stops [under the Fourth Amendment does not] depend [] on the actual motivations of the individual officers involved." Quoted at *United States v. Everett*, at 488.

The *Everett* decision, at 490, cited to the reasoning in the Supreme Court decision in *Muehler v. Mena*, 544 U.S. 93, 100 (2005), which approved questioning during a police detention, and reiterated that mere police questioning does not constitute a seizure, citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

The Sixth Circuit requires a fact-bound, context-dependent inquiry in each case. *Everett* at 493.

In the instant case, Bazzi's questioning was directed to the truck driver's conduct, including his travel history, his travel plans, the driver's authority to operate the vehicle, and the licensing of the tractor-trailer – context framing questions that help explain or put into context the suspicious behavior Officer Bazzi observed with regard to the registration and the overweight initially, and thereafter, the routing. *Everett* at 494.

In the instant case, Officer Bazzi had probable cause to have Defendant Mungia's vehicle stopped for a misdemeanor violation, improper registration in addition to a civil traffic violation (overweight). As the Sixth Circuit stated in *United States v. Blair*, 524 F.3d 740 (6th Cir. 2008):

> A police officer legally may stop a car when he has probable cause
> to believe that a civil traffic violation has occurred. . . . When a
> traffic stop is supported by probable cause, an officer's subjective
> intent is irrelevant.

*Id*. at 748 (citations omitted).

*Blair* also reiterated that asking for consent to search a properly stopped vehicle does not unreasonably extend the scope of an ordinary traffic stop. *Blair* at 752, citing *United States v. Burton*, 334 F.3d 514, 518-19 (6th Cir. 2003). Here, there was no extended detention, nor a detention for a dog search, as in *United States v. Bonilla*, 357 Fed. Appx. 693, 698 (6th Cir. 2009) (unpublished).

## IV. **APPLYING THE FACTS TO THE LAW**

The initial traffic stop ordered by Officer Bazzi was based upon probable cause to believe that Defendant Mungia had committed a misdemeanor violation regarding improper registration. In addition, there was reasonable suspicion of an overweight violation, a civil infraction.

After the stop, Bazzi asked appropriate questions regarding Mungia's route, received and read his bill of lading and driver's log, his fuel destination, and his load's drop-off destination. When Bazzi received answers to these questions that properly raised his suspicion level, he asked for permission to search the trailer.

The Court finds that the questions and answers were reasonably related to the initial vehicle stop, e.g. the ownership of the vehicle, the weight of the load content, set forth in the bill of lading and the log. Mungia's responses raised suspicions regarding his routing, his passing by

13

diesel fuel stations. "Inconsistencies in the claimed purpose of a trip may be grounds for reasonable suspicion. *Bonilla* at 699.

The Court, having the benefit of viewing the conflicting testimony of Agent Bazzi and Defendant Mungia, credits the truthfulness of Bazzi's testimony. Thus, the Court finds that as long as the broken seal would be replaced by Bazzi, which it was, Mungia gave him permission to break the seal. Mungia voluntarily opened the lock to allow Bazzi to search the trailer. The Court concludes that Mungia's testimony on this issue was not credible, and that his testimony in general was undermined by his attempt to claim that he did not understand the English language at the examination, despite the fact that he had conversed in English at the initial stop. Thereafter, Mungia kept waffling, conceding that he understood business English, but not enough English.

The Court further concludes that Bazzi received consent and permission to open and enter the trailer. Given that the marijuana was hidden way back in the trailer, it is logical that Mungia would allow Bazzi to look inside the trailer. The Court further finds that upon encountering the unaligned pallets with the odd boxes with questionable markings in a tractor full of broccoli, Bazzi could properly go into a box where he found a narcotic contraband-appearing leaf, that upon examination appeared to be marijuana and upon testing was confirmed to be marijuana.

The testimony of Officer's Bazzi and Whitcomb, also confirmed by Mungia's testimony, establishes that at no time prior to the seizure of the marijuana, was Mungia arrested, placed in a locked squad car or prevented from leaving. This stop, questioning and consent involved a continuous flow, and there was no arrest or extended detention. The entry into the trailer was

consented to by Mungia, who was not under arrest or under any threats at that time.

For all these reasons, the Court concludes that Defendant's Motion to Suppress is

DENIED.

SO ORDERED.

                               S/Paul D. Borman
                               PAUL D. BORMAN
                               UNITED STATES DISTRICT JUDGE

Dated: September 29, 2010

## CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on September 29, 2010.

                               S/Deborah Tofil
                               Alternate Case Manager